**13-0080SAG to 13-0082SAG**

## AFFIDAVIT FOR COMPLAINT

Detective Matthew Wires, Anne Arundel County, Maryland, deputized federal officer with the DEA task force, being duly sworn, states the following:

### I. AFFIANT'S EXPERIENCE

Your affiant, Detective Matthew Wires, Anne Arundel County Police, deposes and states:

1. I am an investigative or law enforcement officer within the meaning of Section 2510 (7) of Title 18, United States Code; that is a federally deputized officer for the Drug Enforcement Administration in this investigation, who is empowered by law to conduct investigations of and/or make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a duly constituted member of the Anne Arundel County Police since 2005. I completed the Maryland Transportation Authority Police training academy in 2001, during which time I received training in the field of drug recognition, identification, packaging, and report writing. I completed the Anne Arundel County Police lateral academy in 2005, receiving refresher training in the fields of drug recognition, identification, packaging, and report writing. I have been a detective for more than three years in the Anne Arundel County Police Special Enforcement Section, Major Offenders Unit. Prior to that, in my seven years of uniformed patrol, I have been a primary case agent as well as assisted in the seizure of vehicles and money in drug related cases. As a detective, I have made or assisted in numerous criminal arrests related to possession and distribution of several types of paraphernalia and controlled dangerous substances to include methamphetamine, marihuana, cocaine, heroin, Oxycontin, and Methylenedioxy-Methamphetamine (MDMA, more commonly known as Ecstacy). I have been the affiant or co-affiant on numerous search warrants of residences that resulted in the seizure of illegal drugs, weapons and money. I have received in-service training to include several drug and



FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JAN 1 4 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

law enforcement classes. These classes include: 40-hour Drug Identification Course, 24-hour Drug Traffic Interdiction Course, 24-hour Interview Techniques Course, 8-hour Methamphetamine Lab Awareness Course, 40-hour Narcotics Investigation Course, 16-hour Cannabis Indoor Grow Course, 24-hour Techniques for Financial Investigations Course, 24-hour Domestic Drug Interdiction Course, 40-hour Clandestine Laboratory Course, and 48-hour Maryland Top Gun Drug Investigator Course.

3. As a law enforcement officer, and most specifically in the Special Enforcement Section, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

13-0080SAG do 13-0082SAG

## II. STATEMENT OF FACTS AND CIRCUMSTANCES

4. This affidavit is made in support of a criminal complaint against the following three persons:

**DONALD GOODMAN**
DOB: 02-24-1949, black male
104 Wheeler Ave
Baltimore, MD

**JEFFREY DENNIS SMALL:**
DOB: 11-25-1980
700 Mills Way
Annapolis, Maryland 21401

**ALEXANDROS LINEBERRY**
DOB: 06-14-1976 (AKA: Justin Payne)
1413 Mariner Drive
Arnold, Maryland 21012

5. Your affiant has personally participated in the investigation of the offenses referred to in this affidavit and has witnessed many of the facts and circumstances underlying this investigation. In addition, the statements contained in this affidavit are based on reliable information provided by other law enforcement agents and cooperating witnesses, as well as official documents and reports reviewed in furtherance of the investigation. Since this affidavit is submitted for the limited purpose of supporting the criminal complaint, I have not included each and every fact known to me that relates to this investigation. I have set forth only the facts necessary to establish probable cause that **DONALD GOODMAN, JEFFREY DENNIS SMALL, and ALEXANDROS LINEBERRY**, did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury to knowingly, intentionally and unlawfully distribute and possess with the intent to distribute 1000

kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a).

6. As a result of my personal participation in the investigation and my review of the sources of information detailed above, your affiant states that there is a drug trafficking organization operating in Anne Arundel and Howard Counties, Maryland. The Anne Arundel County Police, the Howard County Police Department, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Homeland Security - HSI, the Internal Revenue Service and the U.S. Postal Inspection Service are jointly conducting this investigation. This investigation which began in January of 2012, has gathered evidence from confidential sources of information, controlled purchases of drugs, search warrants, fixed and mobile surveillance, public document checks, postal seizures, vehicle stops, ping and GPS orders on telephones and vehicles respectively, DNR analysis, consensual and Court Authorized wiretaps, bank records and other investigative methods.

**A. Early Investigation and Confidential Sources of Information.**

7. Beginning in January of 2012, three different sources of information, independently of each other, described a marijuana distribution organization that was receiving parcels of marijuana (at least 20 pounds) in the mail regularly, and was distributing it in Anne Arundel and Howard Counties in Maryland. One member of the conspiracy, a man identified as Frederick Thomas, was in a single car accident westbound on Route 100 at Quarterfield Road in Anne Arundel County, Maryland. Inside of his car, agents discovered a shrink-wrapped package of marijuana (590 grams), a money counting machine, a talley sheet, and 126 bank money bands (for $2,000). According to the three sources, this group gets marijuana from California and New

4

13-0080SAG to 13-0082SAG

Jersey, and stores the drugs in a home in Glen Burnie until the drugs are distributed. Scott Segal was identified as the main wholesale distributer in Anne Arundel County, Maryland, who receives 50 pound shipments of marijuana at a time. Segal's source of supply was described as Kerem Dayi. Dayi's contacts for marijuana are in California, and he has business partners in his marijuana business in New Jersey as well. According to two of the sources, the organization maintains an Ebay business, "Krush, NYC, LLC," doing sales over the internet and also uses a warehouse in Howard County for that business and for distribution of marijuana. Sources advised that Dayi is married and his wife works at a Bank of America branch in Crofton, Maryland., used by the organization to launder drug money.

8. Another member of this organization was identified as Anthony Santoiemma who brokers deals on behalf of Dayi, and makes a commission. One CI purchased a pound of marijuana from Santoiemma under the direction of law enforcement. All three sources also identified Ryan Wheeler as a wholesale cocaine customer of Dayi. According to them, Wheeler lives in Annapolis, and supplies ounce and pound quantities of marijuana and cocaine to others for further distribution. Like Segal, Wheeler gets packages containing pounds of marijuana from California through the U.S. mails, and uses others to receive them. One source advised - by overhearing communications between conspirators - that marijuana proceeds have been sewn into handbags and delivered to the source of supply in California. According to this source, Santoiemma supplied young women to the organization who would fly from BWI to California with these handbags.

**B. Pro-active Investigation.**

9. Since obtaining this information from three separate sources, the investigation has confirmed the existence of this marijuana distribution organization in and around Howard and Anne Arundel Counties in Maryland, primarily dealing in marijuana, but also dealing in cocaine, and diverted pharmaceuticals. Agents have conducted one to five months each of court ordered electronic surveillance on telephones used by Santoiemma, Wheeler, Segal, Dayi, and others. These intercepts have confirmed that this organization, which is headed by Kerem Dayi is receiving large shipments of marijuana through the mail (20 pounds at a clip) and by vehicular delivery (50 to 400 pounds) to Maryland. Dayi has supply contacts in California and New Jersey. This organization also uses various money laundering methods to include bulk cash smuggling in vehicles, sending cash in parcels through the mail and commercial delivery services, structuring deposits into bank accounts and removing it (funneling) from banks in other states, and by investing money into, and removing money from, otherwise legitimate businesses being operated by the same members of the conspiracy. Based upon the methods of investigation described above, members of the conspiracy and their roles in this criminal organization - relative to the search warrant applications herein are as follows: Kerem Dayi runs the organization. Your affiant knows that Dayi directs the storage of marijuana at houses rented and managed by Dayi and members of the organization, and he directs the movement of marijuana and cash between Maryland, California, Ohio and New Jersey. As indicated by the sources of information, Dayi is the registered agent of a Limited Liability Company registered with the Maryland Department of Assessments and Taxation called "Krush NYC, LLC," (hereinafter "KRUSH") located at 8250-D Preston Court, Jessup, Maryland 20794.

1. **DONALD GOODMAN**

10. On two occasions, agents followed Segal to a location at 1401 Reisterstown Road, Pikesville, Maryland. There is a small office building at that location and it was not known at that time where inside the building Segal went. The first time, on February 21, 2012, between 12:11 pm and 3:40 pm, agents followed Segal from his home to the Crofton Post Office, back home, to the Glen Burnie Post Office, and then to this location in Pikesville. Simultaneously Santoiemma was seen leaving Segal's house just before noon. Santoiemma was then observed at the business, "Krush" on Preston Court in Jesseup at 12:13 pm, and moved his car to behind the business - where the loading dock is located - five minutes later. Santoiemma left Preston Court. At the Reisterstown Road location, Segal met with Santoiemma and Dayi out in the parking lot. After meeting in Pikesville at 3:40 pm, for no more than five minutes, Segal, Dayi and Santoiemma left. All three were observed back at Segal's house at 4:07 pm. At 5:31 pm Santoiemma and Dayi were observed carrying a large trash bag out of Segal's house, and took it to Dayi's house.

11. Again on March 29, 2012, agents followed Segal to the Pikesville building and observed Segal exit the building carrying a large cardboard box, which he placed in the trunk of his car. Segal was followed back to his residence. He drove from Pikesville to Glen Burnie on I-695 and I-97 and at times was traveling at least 80 miles per hour and in your affiants opinion, was conducting counter-surveillance manuevers. Agents conducted closer surveillance at this Pikesville address. In the basement was a luggage repair shop. There was a pharmacy on the ground floor, and a half dozen offices at most on the top floor. Two offices were clearly vacant. The others were a doctor's office, and the rest just said "Private." As described above, CI-1 had

7

advised your affiant that marijuana proceeds have been sewn into handbags and delivered to the source of supply in California, and that Santoiemma supplied young women to the organization who would fly from BWI to California with these handbags. So your affiant began to suspect that the luggage store at the location on Reisterstown Road was where Segal, Dayi, and Santoiemma were visiting.

12. On October, 15, 2012, at 11:49 am, Dayi received a call from **GOODMAN**. **GOODMAN** advised "... I already moved now, got me, I got myself in another place... So I got a new address... I'm set up and ready to roll." Dayi responded, "Alright, cool... text me your address." A few moments later, Dayi's telephone received a text: "My new address is g-tech luggage repair shop 14 church lane, pikesville, maryland 21208 upper level". On November 20, 20012, **GOODMAN** called Dayi and said he had two pieces of luggage, and told Dayi that **GOODMAN** thought the post office might have inspected the package. He said it looked as if it had new tape on the boxes. Dayi replied that he would check it when he at got there. On November 25, 2012, agents conducting surveillance at 14 Church Lane, upper level, observed **GOODMAN** and another enter the business at 11:20 am. At approximately 11:35 am, agents observed **GOODMAN** carry two large boxes - sealed with red and blue tape - out of the business and into his silver Toyota Scion. **GOODMAN** left the area. At noon, at Security Square Mall agents observed **GOODMAN**'s unoccupied Scion, parked next to a Black BMW with Dayi in the driver's seat and **GOODMAN** in the passenger seat. They exited the BMW, moved the boxes from **GOODMAN**'s car into the BMW, and they both left in separate directions. Your affiant believes that these packages contained pounds of marijuana. Based upon the intercepted conversations and surveillance, your affiant believes that **GOODMAN** is

8

13-0080SAG to 13-0082SAG

receiving marijuana in the mail for the organization.

### 2. JEFFREY DENNIS SMALL

13. Between January of 2012 and December of 2012, agents have conducted dozens of surveillances at the stash house, Segal's house. On a regular basis, persons arrive, go inside, stay for a short while and carry packages/suitcases/backpacks/etc out of the residence. Or agents have observed Segal leave, meet up with someone in a car in a parking, an exchange is made and Segal returns home. On March 22, 2012, agents conducted surveillance at Segal's house. At 8:57 am, agents observed **SMALL** arrive at Segal's house and go inside. At 9:47 am both Segal and **SMALL** exited the residence. **SMALL** was carrying a large black duffel bag slung over his shoulder and placed it inside the passenger area of his car. Segal went into the trunk of **SMALL**'s car and then went back inside his house. **SMALL** left the area. Segal left the residence at 11:11 am, carrying a large envelope under his arm. Your affiant believes this was a drug transaction.

14. As described above, informants described Wheeler as a customer and supplier to Dayi and his organization. Agents have conducted several months on Wheeler's telephone and have confirmed this information. In early July, 2012, without previous notice, one of these cooperators was approached by Wheeler who gave the CI a heat sealed bag containing a pound of marijuana. Wheeler advised that the price was $3,800. A few days later, (after your affiant paid for the pound and took custody of it) **SMALL** collected $3,800 from the CI for Wheeler.

15. In early November, 2012, intercepted conversations reflected that a delivery of marijuana, possibly 400 pounds, was expected in Maryland. Agents expected the delivery at the organization's stash house, Segal's house, but for reasons involving a violent dispute that took

place inside the stash house, the property was deemed no longer suitable for the delivery. On November 16, 2012, at approximately 7:49 pm, agents surveilled a Truck pulling an 18 foot enclosed trailer arrive at the KRUSH business location. The truck and trailer were directed around back. Agents were not in a position to see the rear of the business. Within 30 minutes, the truck and trailer left the area, and was followed to a Holiday Inn north of Philadelphia, Pennsylvania. Present at the KRUSH warehouse that evening, identified by agents were, Kerem Dayi, Gokhan Scott Segal, **SMALL,** and several other co-conspirators. After the delivery, agents observed **SMALL** leaving the warehouse carrying a white bag and drove away in his vehicle, a 2005 Acura. Others were also observed carrying suitcases and other packages out of the warehouse at that time.

### 3. ALEXANDROS LINEBERRY

16. Several months on Wheeler's telephone revealed that **ALEXANDROS LINEBERRY** directly assists him and keeps drugs in his house for Wheeler. On September 25, 2012, agents intercepted Wheeler arranging a drug deal with others. Agents on surveillance at Wheeler's mother's house (who also assists in this drug operation), observed Wheeler's mother, Lannette Wheeler and **LINEBERRY** exit her house. They went to a post office. Then they went to a second post office and Lannette Wheeler took a package inside. During this time, agents observed Wheeler arrive at his mother's house. He went inside carrying a black backpack. Approximately 15 minutes later, two unknown males arrived at her house, and were permitted entrance. Lannette Wheeler returned to her home, went inside, and then Wheeler and the two unknowns came back outside and met with **LINEBERRY** in the parking lot out front. Wheeler, in his Chevy Silverado, **LINEBERRY** in his Volkswagen, and the two unknowns in their vehicle

10

traveled to Wheeler's house, where all four went inside. Twenty minutes later, all four left Wheeler's house. **LINEBERRY** and Wheeler were in **LINEBERRY**'s Volkswagen, and the two unknowns followed in their vehicle. They all traveled to a Safeway Grocery store located on Ritchie Highway at Arnold Road. Wheeler and **LINEBERRY** left the Safeway parking lot in the Volkswagen, and drove to **LINEBERRY**'s house, less than a mile away. **LINEBERRY** exited his vehicle, and walked around the side of his house towards the rear. One minute later, **LINEBERRY** exited his house with a bag and got back into the Volkswagen. Wheeler and **LINEBERRY** returned to the Safeway parking lot, where Wheeler carrying the bag, exited his car and gave it to the two unknowns still sitting in their car. Your affiant submits this was a drug transaction and that the drugs were at **LINEBERRY**'s house. It is not uncommon for drug dealers to conceal the location where the drugs are kept so they are not robbed.

17. On October 12, 2012, agents intercepted Wheeler discussing **LINEBERRY** in a conversation with another. According to the discussion, when the second of two mailed packages was late arriving at **LINEBERRY**'s house, fearing the worst, **LINEBERRY** took the first package and threw it in the woods behind his house. Approximately five minutes later, Wheeler called **LINEBERRY** directly to see if he was alright. Wheeler reassured **LINEBERRY** not to worry about it, and they agreed to meet.

### III. CONCLUSION

Your affiant respectfully submits that the information set forth above establishes that there is probable cause to believe that **DONALD GOODMAN, JEFFREY DENNIS SMALL, and ALEXANDROS LINEBERRY,** did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury to

**13-0080SAG** c/o **13-0082SAG**

knowingly, intentionally and unlawfully distribute and possess with the intent to distribute 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a).

_____
Detective Matthew Wires
Anne Arundel County Police
DEA Task Force

Sworn to and subscribed before me this \_\_14th\_\_ day of January, 2013.

_____
Stephanie A. Gallagher
United States Magistrate Judge